875 So.2d 230 (2004)
Shadow ROBINSON, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2002-KA-01238-COA.
Court of Appeals of Mississippi.
April 6, 2004.
Rehearing Denied June 29, 2004.
*232 Thomas W. Powell, Lisa Mishune Ross, Jackson, attorneys for appellant.
Office of the Attorney General by John R. Henry, attorney for appellee.
IRVING J., for the Court.
¶ 1. Shadow Robinson was indicted and tried for the murder of Lennell Moore. The jury found her guilty of manslaughter, and the trial judge sentenced her to twenty years in the custody of the Mississippi Department of Corrections. Robinson has appealed and raises nine issues which we state verbatim:
1. Whether the trial court committed reversible error when it failed to review Moore's medical records and take testimony from Moore's psychotherapist before ruling that Moore had not waived the medical privilege by taking Shadow to his psychotherapy session.
2. Whether the trial court committed reversible error when it failed to review Moore's medical records and allow the records to be redacted to show only the relevant, material, and exculpatory evidence.
3. Whether the exclusion of Shadow's testimony regarding statements Moore made when she attended one of Moore's psychotherapy session unconstitutionally interfered with Shadow's right to defend against the charges.

*233 4. Whether the trial court committed reversible error when it allowed Moore's mother to assert the medical privilege via affidavit and did not appoint a guardian ad litem when the court recognized the privilege belonged to Moore's children.
5. Whether the trial court committed reversible error when it prevented defense counsel from telling the jury in opening statements about other fights between Moore and Shadow and Shadow's state of mind as a result of those violent acts.
6. Whether the evidence was insufficient to support the jury's rejection of Shadow's self-defense claim when the jury did not have all the evidence which when viewed would lead a reasonable person to conclude that Shadow acted objectively reasonable on March 8, 2001.
7. Whether the cumulative errors in this case denied Shadow a right to a fair trial.
8. Whether the trial court erred when it denied Shadow's appeal bond immediately after the trial and later raised the bond in the absence of evidence that Shadow was a flight risk.
9. Whether the trial court's sentencing of Shadow was so harsh that it is cruel and unusual.
¶ 2. We find no reversible error; therefore, we affirm the judgment of the circuit court.

FACTS
¶ 3. The recitation of facts surrounding the circumstances of the tragic death of Lennell Moore comes from the defendant, Shadow Robinson. Only three witnesses, Moore, Robinson, and Robinson's boyfriend, Shontarri Cobbins, witnessed the shooting. Because Moore was killed, we do not have the benefit of what his version of the events would have been. Cobbins did not testify during the State's case-in-chief. He did, however, give rebuttal testimony.
¶ 4. On the evening of March 8, 2001, Shadow Robinson called Moore and asked him to pick up their daughter in Canton and bring her home to Robinson's apartment in Ridgeland.[1] Initially, Moore indicated that he was not going to honor Robinson's request. However, sometime later Moore arrived at Robinson's apartment with the daughter. When he arrived, Robinson's new boyfriend, Shontarri Cobbins, was present. Cobbins opened the door and let Moore into the apartment.
¶ 5. According to Robinson, Moore walked into the apartment "talking off the wall ... and yelling" at her because she had been hanging up the telephone on him. She told Moore to go lay their daughter in the bed in the bedroom. Moore complied but, according to Robinson, came out of the bedroom "walking fast and pointing down in [her] face ... going off, cussing [her] out, [and] calling [her] names." Robinson testified that Moore told her that "he was going to slap the s___ out of [her] because [she] would not shut up." Robinson further testified that Moore then "drew his hand back to slap [her] but `Shon' [Shontarri Cobbins] grabbed him" and told Robinson to run into the bedroom. Robinson testified that she ran into the bedroom, but Moore came in "so fast" that he tore the canopy over their daughter's bed. Moore then hit Robinson, knocking her on her side over the bed and *234 against the wall. She "bounced up and hit him, and he hit [her]." Moore was on top of her when Cobbins came into the room and pulled Moore off of Robinson. After Cobbins pulled Moore off of Robinson, Robinson went outside to get her daughter. She then came back inside the apartment and watched Cobbins and Moore fight for a while. Thereafter, at some point, Moore, while still being restrained by Cobbins, jumped at Robinson, grabbed a glass from a table in the living room and raised his hand to throw it, but Cobbins hit him on the hand and the glass fell. Robinson picked up the glass and threw it at Moore. She missed and the glass hit the wall and broke. According to Robinson, "he [Moore] sho nuff [sic] got to bucking then." As Moore and Cobbins struggled, Robinson watched, while, at the same time, she "was just snapping, going off, cussing him [Moore] out, cussing back, going back off on him ... telling him to get out ... hit the door" because he did not pay any bills there.
¶ 6. Cobbins told Robinson to go back in the room where the children were and to lock the door. She went in the room but did not lock the door. She remained in the room two to three minutes. Moore did not attempt to come into the room. While Robinson was in the room, she retrieved her pistol and turned up the volume on the television. She then emerged from the room with the gun and watched Moore and Cobbins tussle for six to eight minutes although neither of them saw her.
¶ 7. What happened next is best related through the following colloquy which occurred on direct examination between Robinson and her attorney:
Q. So at what point did he try to come at you or did he calm down? What happened next after that?
A. He said he was going to go. He told Shon [Shontarri Cobbins]. Shon had him around his waist, and he told Shon, f___ it, I'm fixing to go.
Q. Okay.
A. And he knocked Shon's hands off his waist, and that's when hehe wasn't fixing to go. He was coming back at me.
Q. Okay. And what happened when he came back at you?
A. The gun went up, and he turned, and he turned, and he turned, and II mean, I wasn't trying(pauses)I wasn't trying to shoot him. He just got shot.
Q. So did he act like he was walking out of the door?
A. No.
Q. What did he do?
A. He jumped at me.
Q. Okay. And he jumped at you, and what happened when he jumped at you?
A. I raised the gun.
Q. And did you mean to discharge the gun?
A. No, because I didn't know it was loaded. I didn't know nothing was in it. It wasn't but one bullet. Who would want to kill somebody with one bullet?
¶ 8. According to Robinson, Moore and Cobbins fought approximately thirty to forty minutes before she fired the fatal shot.
¶ 9. The shooting incident was investigated by Officer Donald Scott Martin of the Ridgeland Police Department. When he arrived at Robinson's apartment, he found her uncooperative although she admitted that she had shot Moore. Martin saw nothing about Moore or Robinson's person indicating that either of them had *235 been in any type physical struggle.[2] Further, Martin testified that there were no signs that a fight or physical struggle of any sort had occurred in the apartment. No furniture was broken, and no walls were damaged. Everything appeared to be in place except a picture in the children's room which was resting next to a wall.
¶ 10. Additional facts will be related during the discussion of the issues.

ANALYSIS AND DISCUSSION OF THE ISSUES

1. Waiver of Medical Privilege
¶ 11. Robinson's first four issues are interrelated and revolve around the trial judge's finding that Moore did not waive the medical privilege and the judge's ruling that Libby Johnson, a psychotherapist who conducted only two counseling sessions with Moore, could not testify concerning communications presumably made by Moore to her during one of the sessions.[3] At least one of the counseling sessions was allegedly attended by Robinson with Moore's consent. Because we find the waiver, or lack thereof, of the medical privilege to be irrelevant on the facts of this case, we pretermit a detailed discussion of these issues.
¶ 12. We begin our discussion with the observation that Robinson did not testify that she attended either of the two sessions, and there was no evidence produced at trial which proves Robinson's presence at either of the counseling sessions allegedly attended by Moore. The only suggestion in the record that Robinson may have attended one of the sessions came during the hearing on the motion in limine when the attorney for the State, while not admitting that Robinson was present during one of the sessions, said that it was his understanding that Robinson's presence was necessary for the treatments. However, the record upon which the trial judge relied does not contain any proof that Robinson did in fact attend either of the sessions, and there was no stipulation to that effect by the parties.
¶ 13. Although it is questionable as to whether the record is sufficient to support a finding that Robinson attended one of the sessions, we note that the State does not take issue in its brief with this questionable fact. Therefore, for purposes of this opinion, we assume that Robinson did in fact attend one of the sessions.
¶ 14. The trial judge refused, because of the medical privilege, to allow Johnson to testify concerning her counseling sessions with Moore. It appears that in making this decision, the trial judge accepted the assertion made by the attorneys that Robinson did in fact attend one of the sessions. Robinson argues that Moore waived the privilege when he freely took her to one of the counseling sessions.
¶ 15. When the trial judge refused to allow Johnson's testimony, the parties agreed to making a proffer of Johnson's testimony by offering her notes of her counseling sessions with Moore. The dissent argues that the trial judge denied Robinson's attorney the opportunity to *236 proffer Johnson's testimony through Johnson. This is simply not the case as the following colloquy proves:
MS. ROSS: Libby Johnson is the psychotherapist. We'd like to do a proffer on her testimony if you are going to grant their motion.
* * * *
THE COURT: Well, I'm hesitant about letting the person to whom the communication was made make a proffer because I would not want that person to violate Section 13-1-21 because there are criminal penalties associated with that. I'm going to try to look at that and see.
MS. ROSS: Well, Your Honor, if we could seal the proffer so that the Supreme Court or Court of Appeals, whoever is reviewing this record, would be able to consider the proffer when reviewing the error, if any.
* * * *
THE COURT: Is there any way we can mark the records and seal them? And whatever is in the records is what she would testify to, I would guess.
MR. POWELL: Yes, sir.
MS. ROSS: Your Honor, if you won't allow us to call her to go into detail, if we could just put her on the stand and say that she would testify to the documentation in the records if called, then that could be our proffer, along with the records. Your Honor, we don't mean to prolong this, but we would ask the Court to also look at Rule 501 of the Rules of Evidence that says that no person has a privilege, and subsection 4, to prevent another from being a witness or disclosing any matter or producing any item or writing.
* * * *
THE COURT: The comment is pretty interesting to that rule. Normally this wouldn't come up until the defense puts on a case or puts on witnesses, but the State filed the motion, and so I guess we need to dispense with the motion prior to beginning the trial, being a motion in limine. How do you intend to proceed with the witness? Are you going to do like Ms. Ross said and just put the witness on and let the witness say that they're going to testify as to what was in the medical records and then submit the records under seal?
MR. POWELL: Yes. If you're not going to allow her to testify what's in the notes,
Your Honor, that's correct.
THE COURT: Well, I'm not going to let her testify unless there's a waiver of that privilege. What I'm trying to figure out is, do I need to clear the courtroom on the proffer to maintain the confidentiality, but, see, if you're going to just ask her did she treat him, does she have her medical records and if that's what she would testify to, is what's in the medical records, then I see no reason to clear the courtroom. And I understand that there must be a 24-hour notice given to the press if we're going to close the trial.
MR. WILKINSON: Your Honor, it's the State's position that it would be confidential for her to even say she treated the victim.
THE COURT: Well, 13-1-21 talks about a voluntary disclosure. Well, it speaks in terms of willful violation of the provisions, and if she's testifying under subpoena, I don't know that that would be a willful violation. Have you got any objection to making a stipulation that if she testified that she'd testify to what was in the medical records?
MR. WILKINSON: No, Your Honor.
THE COURT: No?

*237 MR. WILKINSON: We have no objection to that.
THE COURT: Okay. If they make a stipulation, then you don't have to put her on, put the medical records in with the stipulation that that's what she would testify to, would that accomplish the same purpose, rather than her just coming in here and saying, that's what I'd do. I'm trying to figure out a way to do this so it won't put her in any kind of jeopardy and still preserve the records in the matter.
MS. ROSS: Just a minute, Your Honor. We're trying to make sure her notes are legible so that they could be read.
THE COURT: You're trying to determine legibility, and she's a doctor?
MS. ROSS: Yes, Your Honor. Her writing is not as bad as most doctors.
THE COURT: Oh.
MR. POWELL: We would agree with that, Your Honor.

THE COURT: Okay.
MR. POWELL: We just need to make a copy of it.

¶ 16. It seems fairly clear from the discussion quoted above that the trial judge struggled with the logistics of accommodating Robinson's counsel in getting the proffer done and preserving the confidentiality of the disclosures made by Moore to the psychotherapist, but there is no doubt that the trial judge was prepared to allow Robinson's counsel to make an unfettered proffer. While the trial judge was firm in his refusal to allow Johnson to testify in the trial, he did not attempt to limit Robinson's counsel's right to make an appropriate proffer through Johnson. He was prepared to clear the courtroom so that could be done.
¶ 17. The State objected to allowing the proffer to be done through Johnson, but to assert, as does the dissent, that the trial judge required the proffer to be made through the tendering of Johnson's notes is not borne out by the record. Rather than requiring that the proffer be made through the tendering of the notes, the trial judge simply inquired as to whether that process would be acceptable. Any fair interpretation of the quoted conversation compels the conclusion that, at the end of the extended discussions about how to do the proffer, Shadow's counsel freely agreed to submit Johnson's written notes as the proffer of what Johnson would testify to if she were called as a witness. That discussion also demonstrates that the trial judge never refused to allow the proffer to be done differently.
¶ 18. The trial judge did not review the notes before making his decision to disallow Johnson's testimony. However, the notes were sealed and submitted with the appellate record for our review. The notes reflect that Johnson saw Moore only twice for anger management in May and June of an unspecified year. Robinson shot Moore on March 8, 2001. Since the sessions occurred in May and June, they would have had to have taken place at the latest in May or June of 2000, if not in some earlier year. If the discussions occurred a year or two prior to the killing, or even nine or ten months earlier, it would be difficult, for at least three reasons, to see how they could possibly hold any beneficial value to Robinson's defense.
¶ 19. First, the fact that Moore had been treated for anger management in a prior unspecified year does not prove that, during the period of time leading up to the killing, he had engaged in such aggressive and violent behavior with Robinson so as to warrant her having a reasonable apprehension that, in any altercation between them, he was likely to do her serious bodily harm. Second, Robinson did not testify that Moore was still engaging in aggressive *238 and uncontrollable behavior toward her or that his past behavior toward her left her apprehensive of him. Thirdly, there was no addendum or supplement to Johnson's dated report indicating the current status of Moore's anger management problem. It may be that when this incident occurred, Moore had the problem under control.
¶ 20. Notwithstanding the temporal problem with the notes, we have reviewed them and find nothing relevant or exculpatory in them. We reject Robinson's claim that information from Moore's counseling sessions with Johnson would have aided her defense. Although Robinson argues in her brief that she shot Moore in self-defense, her trial testimony, as set forth in the fact portion of this opinion, belies this assertion. In light of Robinson's testimony, we cannot conceive under any scenario how information about Moore's counseling sessions with Johnson would have been relevant or helpful to her defense. She never contended or testified that fear of Robinson, based on his history of relating to her, caused her to fire the fatal shot. While her attorney, through leading questions, got her to eventually say that she feared Moore would get free of Cobbins's grip and come after her, the uncontradicted fact is that she shot Moore in the back, and she testified that she did not intend to shoot him. Based on Robinson's testimony, despite the leading by her attorney, no case of self-defense was established. It is clear that it was her un-coached position that the shooting was somehow an accident, that the gun just discharged. On this evidence, we need not decide whether Moore waived the privilege by taking Robinson to one of the counseling sessions. However, even if he did, nothing contained in Johnson's notes, the contents of which were withheld from the jury, prejudiced Robinson's defense.
¶ 21. The dissent, citing several cases which discuss the interplay between the privilege and a defendant's right to obtain relevant and exculpatory evidence covered by the privilege, argues that the information contained in Johnson's notes is relevant and that the trial judge committed reversible error in not conducting an in camera review of the notes and the evidence to be offered through Johnson. The basis for the dissent's argument is that Robinson's defense was self-defense, and that this evidence was relevant on the question of whether Robinson had a reasonable apprehension of fear.
¶ 22. The obvious problem with the dissent's argument is that it assumes or accepts the assertion that the facts support Robinson's claim of self-defense. The claim of self-defense must be fact grounded. It is not enough to verbally claim self-defense but testify, as did Robinson, that the shooting was an accident. Further, the determination of whether a reasonable apprehension of fear exists cannot be made in a vacuum. Whether Robinson had a "reasonable apprehension of fear" that she was about to suffer death or some serious bodily injury at the hands of Moore must be considered under the totality of the circumstances that existed at the point in time when she fired the fatal shot. What were those circumstances?
¶ 23. First, and of critical importance, Moore was not armed. Second, a scrutinization of Robinson's own testimony reveals that she had not shown any apprehension or fear of Moore during their fight earlier that night. As to that fight, she testified that Moore hit her and that she bounced up and hit him back. She further testified that he cussed her, that she cussed him back, and that she "was just snapping, going back off ... on him." Third, after Cobbins pulled Moore off of Robinson, she testified that she went outside, *239 got her daughter, came back in and watched Cobbins and Moore struggle for a while. Fourth, she went into the children's bedroom, retrieved her pistol, came back out and observed Moore and Cobbins for six to eight minutes although they did not see her. Lastly, according to Robinson, Moore was in the apartment struggling with Cobbins, including the altercation with her, for thirty to forty minutes, yet, she never called the police despite ample opportunities to do so. These facts, along with Robinson's testimony that she did not intend to shoot Moore, dispel any credible notion that she shot Moore out of a "reasonable apprehension of fear" that he was about to do serious bodily injury to her.
¶ 24. Even if we were to hold that Robinson's claim of self-defense is grounded in the facts, we would still find no reversible error in the trial judge's failure to conduct an in camera review of Johnson's notes. We reach this decision because of two reasons. First, as we have already mentioned, Johnson's notes contain no exculpatory information. Second, Robinson failed to show that the anger management problem, for which Moore had been treated in some unspecified prior year, had not abated and that he had continued to exhibit, until the time of the shooting, aggressive and violent behavior toward her. Therefore, even if Moore's problem with controlling his anger and his desire to control Robinson through intimidation might be admissible in her trial for murdering him, there would still be the need to show the relevancy of his conduct from a temporal standpoint. That was not done here. It follows that the dissent's argument that this case should be reversed because the trial judge failed to make an in camera review and redaction of the notes misses the mark. Even if a review had taken place, no portion of the notes should have been admitted as they contained nothing exculpatory and their relevancy was not established.

2. Abridgement of Right to Make Appropriate Opening Statement
¶ 25. Robinson contends that the trial judge prevented her attorneys from mentioning, in their opening statement, previous acts of violence perpetrated upon her by Moore. Robinson misstates what occurred. The trial judge ruled that Robinson could not mention any acts of violence on the part of Moore until she offered evidence that Moore was the aggressor on the night in question and that he perpetrated an overt act against her. This ruling comports with the jurisprudence of this state. See Freeman v. State, 204 So.2d 842 (Miss.1967); M.R.E 404. This issue is without merit; therefore, we affirm the ruling of the trial judge.

3. Sufficiency of the Evidence
¶ 26. Robinson argues that had the jury been allowed to hear testimony from Johnson regarding her counseling sessions with Moore, the jury "may have concluded ... [that] the killing of Moore... was objectively real to [her] and [that] she acted as a reasonable person under the circumstances then and there existing." Apparently, Robinson concludes that the evidence which was presented was insufficient because other evidence was omitted. This is flawed reasoning.
¶ 27. Our reading of the record convinces us that the jury was more than generous to Robinson in not returning a verdict of murder. Robinson testified that she was in a back room with her children while Moore and Cobbins struggled in a front room. Cobbins told Robinson to lock the door, but she refused. There is no evidence that Moore ever made any attempt *240 to enter the room where Robinson was prior to Robinson's emerging from the room and firing the fatal shot. In fact, there is evidence that Robinson deliberately and intentionally went into the room to get her pistol to kill Moore. She turned up the volume on the television just before she left the room to fire the fatal shot. A very logical inference to be drawn from that act is that she turned the volume up so that the children would not hear the fatal shot that she was preparing to deliver to their father. When she emerged from the room with the gun, according to her testimony, she watched Moore and Cobbins tussle for six to eight minutes although neither of them saw her. Of course, Robinson's assertion about all the fighting that took place over a period of thirty to forty minutes is circumstantially contradicted by Officer Martin's testimony that the apartment was not in disarray and that neither Moore nor Robinson appeared to have been in a fight. This issue is without merit.

4. Cumulative Errors
¶ 28. We have determined that Robinson was not prejudiced by the trial judge's ruling regarding the medical waiver because nothing contained in Moore's medical file was relevant to her defense based on the facts as testified to by Robinson herself. This ruling of the trial judge formed the basis of Robinson's first four issues. Since we have found that Robinson was not prejudiced by the trial judge's ruling on the medical waiver issue, it necessarily follows that there can be no cumulative prejudice flowing from the ruling no matter the number of issues predicated upon the notion that the ruling was erroneous.

5. Appeal Bond
¶ 29. Robinson contends that the trial court erred in refusing to allow her to remain free after the verdict. Robinson misstates the trial court's position. The court advised Robinson's attorneys that it would not allow her to remain free after the verdict was returned until she had in fact posted an appeal bond. Apparently, the trial court set the appeal bond at $150,000. It was later raised to $200,000 as a result of the State's motion that Robinson constituted a flight risk. Robinson contends that the trial court erred when it raised her bond without making findings of fact.
¶ 30. Since we have affirmed Robinson's conviction, we find these issues to be moot, but even if they were not moot, we would find no abuse of discretion on the part of the trial judge in not allowing Robinson to remain free post-conviction until she had posted a proper appeal bond. After her conviction, she was not entitled to remain free pursuant to any appearance bond that she may have posted to guarantee her appearance in the trial court. A new bond was needed to guarantee Robinson's presence in the Mississippi Supreme Court, although, depending on what arrangements Robinson had with her bonding company, that may have been accomplished without her paying an additional fee assuming she had utilized a commercial bonding company.

6. Harshness of Sentence
¶ 31. Robinson contends that her sentence of twenty years for her manslaughter conviction was "so excessive given the nature and details of her crime, as to be cruel and inhumane and disproportionate when viewed against similar sentences given for like offenses." The State points out that this issue is procedurally barred because it was not raised in the trial court. We agree. However, procedural bar notwithstanding, we also note *241 that Robinson also neglects to provide us with any statistics regarding her proportionality argument. Therefore, we offer no further comment on this issue. Suffice it to say that the law of this state provides a maximum sentence of twenty years for manslaughter. Sentences which are within the statutory limit are not considered cruel and unusual punishment. Ferrell v. State, 810 So.2d 607(¶ 20) (Miss.2002). Robinson cites Davis v. State, 724 So.2d 342 (Miss.1998) in support of her contention that her sentence should be reversed. We find no applicability of Davis to the facts here. This issue is wholly without merit.
¶ 32. THE JUDGMENT OF THE CIRCUIT COURT OF MADISON COUNTY OF CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO MADISON COUNTY.
KING, P.J., BRIDGES, THOMAS, LEE, AND MYERS, JJ., CONCUR. GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY MCMILLIN, C.J., SOUTHWICK, P.J., AND CHANDLER, J.
GRIFFIS, J., dissenting:
¶ 33. The primary issue is the admissibility of evidence from Lennell Moore's sessions with Libby Johnson. The majority finds the waiver of the medical privilege to be irrelevant and intentionally disregards or omits a detailed discussion of these issues. It is on this issue that I disagree and respectfully dissent.
¶ 34. There are three separate grounds to reverse and remand this case for a new trial. First, Shadow's presence at one of the sessions waived the confidentiality of any communications during that session. Second, the majority, just as the trial judge, relies on assumptions and conjecture because the trial judge erred by not allowing a full and complete proffer of the proposed evidence. Third, based on the information available, the exclusion of the evidence from Moore's sessions with Ms. Johnson interfered with Shadow's right to present her claim of self-defense.
¶ 35. The majority simply concludes that it does not matter what evidence Ms. Johnson may have offered. Instead, the majority has concluded that her "notes" were not relevant. There are several problems with this conclusion. The majority cites no authority for this proposition. The majority fails to accurately and completely describe the content of the "notes" or for what purpose they were offered. More importantly, the majority concedes, yet disregards the fact, that the trial judge never reviewed the notes or considered the evidence that could be offered by Ms. Johnson. The majority cannot recite this information because the trial judge erred in the manner in which he considered and ruled upon this evidence. I find this error.
¶ 36. We must examine how this issue was presented to the trial court. On the day before the trial, the State filed a motion in limine asking the court to disallow any evidence from "medical professionals who may have treated or counseled the victim either physically or psychologically." On the morning the trial began, the court heard argument on the motion and considered whether the proposed evidence was protected by the privilege, thereby inadmissible.
¶ 37. The majority and I agree that the record provides no indication that the trial court actually considered the status of Ms. Johnson, the substance of her testimony, a summary of the facts or evidence she *242 would offer, or the documentary evidence in the form of Ms. Johnson's notes. Nevertheless, the court granted the motion in limine.
¶ 38. From the colloquy, it is clear that the defense counsel immediately asked the court to accept a proffer of Ms. Johnson's testimony, through a detailed examination of Ms. Johnson. The court refused. Instead, the court suggested that, and then instructed, defense counsel to proffer only Ms. Johnson's notes, under seal, for review by this Court. The majority characterizes the conclusion of the colloquy as defense counsel's accepting the form of the proffer. Such was not the case. Defense counsel offered two other alternatives, which were rejected by the trial judge, before the tender of the notes was allowed. This may not be characterized as acceptance.
¶ 39. Our review is limited to the motion, the transcript of the hearing and the notes. We must rely on this information to determine whether the trial court's ruling on the motion in limine, excluding any evidence about Moore's sessions with Ms. Johnson, was reversible error. The following facts may be gleaned from the record.
¶ 40. Moore met with Ms. Johnson on several occasions. Robinson was invited to attend and attended at least one of the sessions. This critical fact is reluctantly accepted by the majority, yet disregarded. At the hearing, the court and the attorneys discussed Shadow's presence at one of the sessions as an established fact; there is nothing in the record to indicate that her presence was ever in controversy. Indeed, the assistant district attorney told the court, "[i]t's my understanding that [Robinson] was a necessary party for those treatments," conceding that she was present but arguing that the privilege was not waived by her presence.[4]
¶ 41. The State's brief, mirroring the assistant district attorney's statement, concedes that Robinson was present at one session, but only argues that her presence could only waive the privilege for that session. Robinson's presence at one of the sessions is not in dispute. The record simply does not reflect which session Robinson attended.
¶ 42. Robinson planned to call Ms. Johnson to testify about the session.[5] Unfortunately, this Court does not have an abundance of evidence before us to determine exactly what Ms. Johnson would have testified about or what documentary evidence she may have offered. We only have Ms. Johnson's "notes" to review and consider the relevancy of her testimony.
¶ 43. Based on my review of Ms. Johnson's notes, I find that the notes do indeed contain information that the jury may find to be relevant, material and exculpatory. The principle issue in the defense's claim *243 of self-defense was whether Robinson had a reasonable apprehension of fear. Wade v. State, 748 So.2d 771, 775 (¶ 13) (Miss. 1999). Argument of counsel, at the hearing, clearly indicates that Moore was seeing Ms. Johnson for court ordered counseling for assistance with his prior behavior. Ms. Johnson's notes indicate that the counseling was for Moore's problems with anger management, control issues, intimidation, and his failure to take any responsibility for his anger. We do not know what was said during the counseling sessions. We do not know whether Moore made any threats to Robinson or how Robinson was involved in Moore's problems with anger management, control issues, intimidation, or for Moore's failure to take responsibility for his anger.
¶ 44. Rule 401 of the Mississippi Rule of Evidence provides:
"Relevant Evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
¶ 45. The issues that Ms. Johnson discussed with Moore (i.e., anger management, control, and intimidation) may have a "tendency to make the existence of any fact that is of consequence to the determination of the action [whether Robinson had a reasonable apprehension of fear] more probable ... than it would be without the evidence." M.R.E. 401. As discussed in detail below, neither the trial court nor this Court knows the substance of Ms. Johnson's testimony. However, because of the facts that are presented to us in the record, I am of the opinion that such evidence is, or may be, relevant to Robinson's claim of self-defense. Certainly, if Ms. Johnson's testimony relates to Moore's behavior directed toward Robinson, I am of the opinion that the reference to Moore's problems with anger management, control issues and intimidation is sufficient to establish its relevance and admissibility.
¶ 46. My consideration continues beyond relevancy. Robinson makes three principal arguments. Each argument, in my opinion, is correct and constitutes reversible error. First, and most persuasive, Robinson argues that her presence at one of the sessions waived the confidentiality of any communications that Moore made to Ms. Johnson. Second, Robinson argues that the trial court erred by not allowing a full and complete proffer of the proposed evidence. Finally, Robinson contends that the exclusion of the evidence from Moore's sessions with Ms. Johnson interfered with her right to present her claim of self-defense.

I. Robinson's presence waived the confidentiality of any communications between Moore and Ms. Johnson, during that session.
¶ 47. Mississippi Rule of Evidence 503(b) provides that a communication between a patient and physician or psychotherapist may be privileged if the communication is confidential. Communications made in the presence of a third party are not confidential, and the patient is deemed to have waived the privilege. M.R.E. 503(b).
¶ 48. Here, the majority accepts the fact that Robinson attended one of the sessions. Yet, the majority then fails to address what, if any, legal effect Robinson's presence had on the State's ability to assert the privilege, citing no authority. The reason is simple. Unless Rule 503 of the Mississippi Rules of Evidence permits an exception to the general rule, Robinson's presence waived any privilege that may be asserted. The majority ignores and completely fails to address this critical issue.
*244 ¶ 49. The trial court, however, accepted the fact that Robinson attended one of the sessions but concluded that Moore did not intend to waive his medical privilege when he invited Robinson to attend a session. The judge reasoned that the communication was made in the doctor's office, in a professional setting, not in an open situation, and it was not uttered to the world in general. The judge then noted that, although they were not married, Robinson and Moore had a close relationship and concluded that intent can be inferred from the relationship.
¶ 50. The trial court's conclusion is contrary to the express language of the privilege. By inviting Robinson to attend, Moore intended that Robinson hear his communications with Ms. Johnson. Mississippi Rule of Evidence 503(a)(4) provides that "[a] communication is `confidential' if not intended to be disclosed to third persons." As to Robinson, Moore could not claim that the communications during that session were intended to be confidential. The State may not make such claim either. While the communications may remain privileged as to the rest of the world, Moore clearly intended that Robinson hear the communications in Ms. Johnson's office. Thus, if Moore intended for Robinson to hear the communications, there is no legal authority for the privilege to apply.
¶ 51. Although the majority does not address this issue, the State's only argument was that the communications were disclosed for the furtherance of Moore's treatment. See M.R.E. 503(a)(4) and (b). However, the State did not offer any reasons for Robinson's presence. There was no information contained in Ms. Johnson's notes to establish how Robinson's presence could possibly further Moore's interest in diagnosis or treatment.
¶ 52. Only one conclusion may be reached from Robinson's presence at one of the sessions; Moore waived the physician and psychotherapist-patient privilege as to the communications held in Robinson's presence. See M.R.E. 503. Accordingly, I find the trial court's refusal to admit this to be reversible error and would remand for a new trial allowing Ms. Johnson to testify about any communications made during the session Robinson attended.

II. The trial court failed to allow a full and complete proffer of the proposed evidence?
¶ 53. Robinson also contends that the trial judge erred when he refused to consider the proposed testimony from Ms. Johnson and refused to review the documentary evidence that she offered. Both the majority and I have discussed the lack of information that the trial judge allowed to be proffered. Here, however, I am of the opinion that the trial court committed reversible error by not allowing a sufficient proffer of evidence for review by this court.
¶ 54. The trial court must consider all "[p]reliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence." M.R.E. 104(a). According to the comment to Rule 104(a), the trial court is responsible for determining the facts necessary to determine such preliminary questions. We must review the evidence before the trial court when it granted the State's motion in limine. Unfortunately, however, the record before this Court contains very little information about the existence of a privilege or the substance of the evidence that was to be offered through Ms. Johnson.
¶ 55. The record does not contain sufficient evidence to lay a proper foundation *245 for the trial judge to determine whether the privilege was applicable. Neither the State's motion nor the transcript indicates whether Ms. Johnson was a physician, osteopath, dentist, hospital, nurse, pharmacist, podiatrist, optometrist or chiropractor (Miss.Code Ann. § 13-1-21(1) Rev.2002); was authorized to practice medicine (M.R.E.503(a)(2)), or was a licensed or certified psychotherapist (M.R.E.503(a)(3)). In Touchstone v. Touchstone, 682 So.2d 374 (Miss.1996), the supreme court held that communications with social workers are not privileged under Mississippi Code Annotated § 13-1-21(1) or Mississippi Rules of Evidence 503.
¶ 56. According to the majority's determination of what the record consists of, there is no evidence that Ms. Johnson was a physician or a psychotherapist. She may be a psychotherapist, but the State's motion does not establish that fact. Thus, contrary to the majority's conclusion, the record does not support a finding that Moore's communications with Ms. Johnson, with her status unknown, were within the scope of the psychotherapist-patient privilege. The majority's reliance on this fact is based solely on assumption and conjecture, not on evidence contained in the record.
¶ 57. Next, the record reveals little about whether the trial court even considered the substance of the evidence that was to be offered through Ms. Johnson, or whether there was a waiver by the inclusion of Robinson in one of the sessions. The record only indicates that the trial court allowed defense counsel to submit a copy of Ms. Johnson's notes, under seal, for review by this Court. The record does not indicate whether the trial court reviewed the notes as part of the consideration of this issue.
¶ 58. The majority concludes that the trial judge did not review the notes before making his decision to disallow Johnson's testimony. If the trial judge does not allow a proffer and does not review the notes, which was the only information the trial judge allowed to be proffered, Rule 104 of the Mississippi Rules of Evidence was violated because the court failed to consider the preliminary questions of "the existence of a privilege, or the admissibility of evidence." M.R.E. 104(a).
¶ 59. What the record does reveal, however, is that Robinson's attorneys were not allowed to make a sufficient proffer of evidence.[6] After the court granted the State's motion in limine, Robinson's attorneys specifically asked to call Ms. Johnson and examine her outside of the presence of the jury. The State objected to the timing of the proffer and asserted that "it would be confidential for her to even say she treated the victim." In essence, the State urged the court to not allow any proffer arguing that the proffer itself would violate the privilege. The court resolved this issue in the State's favor and against the request by Robinson's counsel. The court did not allow Robinson's attorneys to proffer the proposed evidence in any of the forms normally used. Instead, the court allowed a proffer that consisted of a one page copy of Ms. Johnson's notes.
¶ 60. In Pennington v. State, 437 So.2d 37, 39 (Miss.1983), the supreme court held *246 that "[t]he trial judge should always permit attorneys to make a record of objectionable testimony or proffer of same in order that this Court may know whether it is relevant or material." (emphasis added). Likewise, in Edwards v. Booker, 796 So.2d 991, 997 (¶ 27) (Miss.2001), the court concluded that:
The purpose of a proffer is to produce a more complete record, increasing judicial economy. The parties were already before the circuit court. To allow a proffer of evidence into the record at this stage of the proceedings would not have imposed any additional hardship on the court. Edwards did not demand that his witnesses actually testify, but merely that their testimony be summarized by counsel so that it may be preserved in the record for appeal. The circuit court erred in not allowing Edwards to make a proffer of evidence.
¶ 61. The majority concludes that defense counsel agreed to make only a proffer of the notes under seal. The record contradicts the majority's finding. Robinson's counsel made a clear and definite request to make an extensive proffer of Ms. Johnson's testimony. Based on the State's objection, the trial court made it clear that an extensive proffer would not be allowed. After a lengthy discussion between the trial judge and counsel, it was clear that the trial judge would only allow the notes to be proffered. The majority incorrectly concludes that defense counsel accepted the method previously determined by the trial court. Indeed, Robinson's counsel was given no other alternative. The finding prevented the defendant from making a full and complete record for this Court to review this important and critical evidence.
¶ 62. Reading the colloquy quoted by the majority, I cannot accept the majority's characterization of the trial judge's position. Indeed, the trial judge was "firm" in his decision to not allow Ms. Johnson to testify or submit a detailed proffer. However, it may not be said that the trial judge "did not attempt to limit Shadow's counsel's right to make an appropriate proffer through Johnson." Indeed, he did.
¶ 63. I find that the trial court's failure to allow Robinson's counsel to make an appropriate proffer of evidence was reversible error.

III. The trial court's exclusion of Ms. Johnson's testimony improperly interfered with Robinson's right to present her claim of self defense.
¶ 64. Robinson contends that the exclusion of the evidence from Moore's sessions with Ms. Johnson interfered with her right to present her claim of self-defense.
¶ 65. The trial court allowed Robinson's self defense theory to go to the jury. The paramount issue in a self defense claim is whether there was a reasonable apprehension of fear. Wade v. State, 748 So.2d 771, 775 (¶ 13) (Miss.1999); Walters v. State, 720 So.2d 856, 862 (¶ 19) (Miss.1998); Hart v. State, 637 So.2d 1329, 1339 (Miss.1994). Therefore, the defendant's state of mind at the time of the incident is key to a defense of self-defense. Brown v. State, 464 So.2d 516, 518 (Miss.1985).
¶ 66. Robinson offered Ms. Johnson's testimony to discuss Moore's issues. As previously discussed, Ms. Johnson's notes reflect that he had problems with anger management, control, and intimidation. Such testimony would relate to Robinson's state of mind, and whether she had a reasonable apprehension of fear of Moore or what he might do to her.
¶ 67. In Brown, the trial court refused to allow Brown to testify that he was seeking legal assistance because of fear of Liddell, the person Brown shot. Id. *247 Brown was not allowed to testify that he called the police after being threatened by Liddell or that he visited the city prosecutor because of his fear of Liddell. The supreme court held:
Since it is the jury's role to pass on the reasonableness of Brown's actions, they are entitled to be made fully aware of all relevant facts which reflect apprehension, fear or anxiety in his state of mind. Because such apprehension, fear or anxiety is a crucial element of self defense, the exclusion of this testimony had the effect of "whittling down" Brown's defense. Eaton v. State, 200 Miss. 729, 28 So.2d 230 (1946).
Brown, 464 So.2d at 518. The court's ruling failed to allow the jury to be "fully aware" of Moore's problems with anger management, control and intimidation.
¶ 68. Recently, in Cox v. State, 849 So.2d 1257 (Miss.2003), the Mississippi Supreme Court considered a similar case, and the court's reasoning applies here. In Cox, the supreme court noted that this Court has held that a "criminal defendant's right to confront witnesses against him does not override a confidential medical privilege." Id. at 1272 (¶ 50) (citing Windham v. State, 800 So.2d 1257, 1260 (Miss. Ct.App.2001)). The Cox court ruled that the medical records in question were confidential, i.e. privileged, even though a third party was present. Cox, 849 So.2d at 1271 (¶ 50). However, the court considered the reason for the third party's presence in deciding whether the patient intent was that the communications remain confidential. Id. The court held that the medical records of the examining physician indicated that he relied upon the third party in developing the patient's medical history. The court, therefore, concluded that the records were confidential even though the third person was present. Id.
¶ 69. Cox's wife, Jo Jo, was involved in an adulterous affair with Charles Rowland. Id. at 1261 (¶ 2). When Rowland was missing, Jo Jo found Rowland's body after he had been shot in the head. Id. at 1261-62 (¶ 3). Because of the knowledge of the affair, Cox was a suspect. Id. at 1262 (¶ 42). During the trial, the court refused to admit Rowland's medical and pharmacological records to prove that Rowland committed suicide. Id. at 1270-71 (¶ 48). On cross-appeal, the State argued that the trial court erroneously admitted documents of Rowland's medical history and claimed that the physician and psychotherapist-patient privilege applied. Id. at 1270-71 (¶ 48). The State argued that the proper procedure, applicable to this case, would be to determine first "whether the records were privileged," and second, "whether the medical privilege must yield to a defendant's right to put on a defense in a criminal case." Id. at 1271 (¶ 49). Cox argued that Jo Jo's presence at one of Rowland's examinations waived the privilege. Id. at 1271 (¶ 50). The court held:
Whether the presence of a third party at a medical examination waives the privilege is an issue of first impression in Mississippi. A Colorado court held that if the patient intends for the examination to be confidential, the privilege is not waived when a third person is present for the examination. People v. Deadmond, 683 P.2d 763, 771 (Colo. 1984) (Even though a patient was so loud during an examination in an emergency room that others could hear his complaints, he did not intend to waive the privilege and therefore medical records were inadmissible.) Indeed, M.R.E. 503(a)(4) provides that "[a] communication is `confidential' if not intended to be disclosed to third persons, except persons present to further the interest of the patient in the consultation, examination, or interview,...."

*248 The notes of the physician who examined Rowland indicate that he relied upon Jo Jo in developing Rowland's medical history. Therefore, the records were confidential even though Jo Jo was present.
Cox, 849 So.2d at 1271 (¶ 50).
¶ 70. Although the supreme court determined that the admission of Rowland's medical records was nothing more than harmless error, the court accepted the State's argument and established the procedure for trial courts to follow when considering a claim of privilege. The court held that:

medical evidence pertaining to a victim may be secured and admissible in limited situations where the medical evidence is relevant, material and exculpatory. See People v. Bean, 137 Ill.2d 65, 147 Ill.Dec. 891, 560 N.E.2d 258, 268 (1990) (Medical records not material to defense inadmissible); State v. Stuck, 434 N.W.2d 43, 54 (S.D.1988) (Denial of access to privileged medical records upheld where defendant was not denied any material information, his defense was not prejudiced in any manner, and the victim's physical or mental health was not at issue).
Because the doctor-patient privilege should be inviolate in most circumstances, we suggest certain actions, in addition to the guidelines of U.R.C.C.C. 2.01, to be taken by trial courts to control a criminal defendant's access to privileged information. An in camera review by the court of the medical records to determine if the evidence is material, relevant and exculpatory would be appropriate. See People v. Bean, 147 Ill.Dec. 891, 560 N.E.2d at 269. If the circuit court finds that the records are admissible, the records should be redacted as much as possible to show only the evidence which is relevant and exculpatory. See id. See also Pennsylvania v. Ritchie, 480 U.S. 39, 58-61, 107 S.Ct. 989, 1002-04, 94 L.Ed.2d 40, 58-60 (1987) (While a defendant has a constitutional right to all material information contained in statutorily privileged records, he had no right to review the full records himself or through his attorney; instead, the trial judge alone should review the records in camera and should then disclose only material information.).
Cox, 849 So.2d at 1272 (¶ ¶ 52-53) (emphasis added).
¶ 71. Under Cox, there are circumstances where the medical privilege must yield to a criminal defendant's right to put on a defense. Id. Before such a decision can be made, however, the court held that the trial court must conduct an in camera review of otherwise confidential and privileged information, and a redacted version of such relevant, material, and exculpatory information should be allowed in evidence. Id. Here, no such review was conducted.
¶ 72. Although the facts here are distinguishable from both Windham and Cox, the legal principle is directly on point. In Windham, the medical records were not admitted. Windham, 800 So.2d at 1259 (¶ 4). The difference from the present case is that the medical records, in Windham, did not relate to the victim but were sought to impeach a third party witness. Also, Windham did not consider whether a third party was present during an otherwise confidential, i.e., privileged, session. Id. In Cox, a third party was present at the session. Cox, 849 So.2d at 1271 (¶ 50). However, the third party present was not the defendant. Id. Here, unlike Windham and Cox, the defendant was the third party present during the session in question.
¶ 73. There is other authority that warrant the admission of privileged information. In State v. Baptist Memorial Hospital-Golden Triangle, 726 So.2d 554, 560 *249 (¶ 22) (Miss.1999), the supreme court ruled that "[w]here the evidence is necessary to the proper administration of justice, it is taken out of the physician-patient privilege." The court reasoned:
"The privilege must be interpreted `in sensible accommodation to the aim of a just result.'" In the Interest of M.P.C., 165 N.J.Super. 131, 397 A.2d 1092, 1095 (App.Div.1979) (quoting State v. Briley, 53 N.J. 498, 251 A.2d 442, 446 (1969)). "Such a privilege is accepted only because... it serves a more important public interest than the need for full disclosure." Id. The purpose of the privilege is to allow a patient to seek treatment without fear of embarrassing disclosure so that he might reveal all of his symptoms to his physician. Id. "[T]he patient-physician privilege must give way where it conflicts with the sensible administration of the law and policy..." Id.

Baptist Mem'l Hosp.-Golden Triangle, 726 So.2d at 560 (¶ 23).
¶ 74. In Jones v. State, 858 So.2d 139, 142 (¶ 5) (Miss.2003), the supreme court concluded that medical records may be removed from the protection of the physician-patient privilege to ensure proper justice. The court held:

A defendant in a criminal case may not rely on this privilege to exclude incriminating evidence. This Court, citing cases from other jurisdictions, made this same point numerous times in Baptist Mem'l, 726 So.2d at 559, 560, stating that "[w]here there is an investigation into a serious and/or dangerous felony, public policy must override the rights of an individual," and that the physician-patient privilege would not be used as a "cloak for a crime."

Jones, 858 So.2d at 142 (¶ 5) (emphasis added).
¶ 75. The decisions of Cox and Baptist Memorial Hospital-Golden Triangle, when considered with Jones, compel the same reasoning when the opposite situation is presented. If a criminal defendant is not allowed to rely on a privilege to exclude incriminating evidence, the State should not be allowed to rely on the privilege to exclude exculpatory evidence.
¶ 76. Other states have also held that confidential communications are admissible not only when they tend to prove a crime, but also when they tend to disprove it. In People v. Benham, 30 Misc. 466, 63 N.Y.S. 923, 924 (Sup.Ct.1900), Benham was charged with murdering his wife through the administration of acid. Benham sought to introduce evidence from a physician, who he had visited, to establish that his wife was addicted to morphine. Id. at 936-37. The evidence would prove that his wife continued to use morphine heavily until the time of her death. The prosecution claimed that the evidence was privileged. Id. The court held "[t]he aid of this section [the physician-patient privilege] cannot, however, be invoked to shield a person charged with the murder of the patient." Id. at 937. The court further ruled:
If, therefore, such declarations and confidential communications from the patient to the physician are admissible under this statute, when they tend to prove the crime of murder, are they any the less admissible when they tend to disprove it? We think not, and it follows that the evidence of Dr. Skinner is admissible.
Id.
¶ 77. More recently, in People v. Davis, 168 Misc.2d 26, 637 N.Y.S.2d 297, 300-01 (1995), the court considered the following question:
whether a victim or his legal guardian may interpose the physician-patient *250 privilege to preclude a Defendant from obtaining medical information which directly bears on whether or not Defendant was justified in undertaking the conduct from which these pending criminal charges flow. Otherwise stated, can a victim use his privilege to prevent a Defendant from obtaining exculpatory evidence within the meaning of Brady v. Maryland,[7] 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.
(footnote added). The court reasoned that "the ostensible purpose underlying the claiming of this privilege has become little more than a stratagem to create an `impediment to the search for truth' and, `is often used as a sword rather than a shield [which] impairs the ability of the court to administer justice.'" Davis, 637 N.Y.S.2d at 301 (citation omitted). The court concluded that "interests underlining a statutory privilege must yield where the Defendant's constitutional rights of confrontation and due process outweigh the need for confidentiality." Davis, 637 N.Y.S.2d at 301 (citing Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); People v. Reidout, 140 Misc.2d 632, 530 N.Y.S.2d 938; People v. Lowe, 96 Misc.2d 33, 408 N.Y.S.2d 873; See People v. Gissendanner, 48 N.Y.2d 543, 423 N.Y.S.2d 893, 399 N.E.2d 924; Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)).
¶ 78. The Ninth Circuit Court of Appeals has also ruled in a strikingly similar case. In DePetris v. Kuykendall, 239 F.3d 1057 (9th Cir.2001), Kelly DePetris was convicted of the shooting death of her sleeping husband. To support her claim of self defense, DePetris attempted to testify about her fear that resulted from reading her husband's journal. Both her testimony and the journal were excluded from evidence. Id. at 1060-61.
¶ 79. The Ninth Circuit held that because the trial court precluded her from testifying fully about her state of mind and because this evidence was critical to her ability to defend against the charge, the exclusion of the evidence violated her right to present a valid defense. Id. at 1063. The court concluded that the exclusion of such evidence "unconstitutionally interfered with her ability to defend against the charges against her. The preclusion of this highly probative evidence went to the crux of the case, and the harm caused by its exclusion was not cured by the receipt of other evidence that was significantly less compelling." Id. at 1065.
¶ 80. As discussed in Cox, this case presented the trial court with just such circumstance where "medical evidence pertaining to a victim may be secured and admissible in limited situations where the medical evidence is relevant, material and exculpatory." Cox, 849 So.2d at 1272 (¶ 52). As discussed in detail above, I find no indication that the trial judge undertook the required in camera review of the evidence or attempted to redact such evidence to reveal only the evidence that could be relevant, material and exculpatory.
¶ 81. The majority concludes that it "cannot conceive under any scenario how information about Moore's counseling sessions with Johnson would have been relevant or helpful to her defense." With this I have a fundamental disagreement. It is not up to this Court to "conceive" any scenario. It is not for this Court to deny Robinson an opportunity to present her *251 defense. Nevertheless, the majority asks the question what were the circumstances that indicated Robinson may have had a reasonable apprehension of fear. The evidence that the altercation occurred because Moore came into Robinson's home and started a fight with Robinson and Cobbins is sufficient for me to conclude that Robinson presented sufficient facts for the jury to determine whether she was in fear of death or of serious bodily injury at the hands of Moore. Ms. Johnson's notes indicating that Moore had past problems with "anger management, control and intimidation" would be relevant evidence for the jury's consideration. I cannot leap to the conclusion reached by the majority. I find that this evidence is, or may be, relevant and material. More importantly, however, the decision of whether this evidence is exculpatory is to be left for the jury, not this Court.
¶ 82. Accordingly, I am of the opinion that there was sufficient information contained in the record to require the trial court to consider the admissibility of the evidence to be offered through Ms. Johnson. The trial court's failure to conduct the required in camera review was reversible error. Because such evidence was prejudicial and could possibly have a substantial impact upon a jury's decision, I would reverse and remand this action for a new trial.
McMILLIN, C.J., SOUTHWICK, P.J., AND CHANDLER, J., JOIN THIS SEPARATE WRITTEN OPINION.
NOTES
[1] Robinson and Moore had two children together although they were never married and their relationship had ended.
[2] Moore was still alive and begging for help when Martin arrived at the apartment.
[3] The dissent argues that the record does not contain sufficient evidence for the trial judge to have made a determination as to whether the medical privilege even applies. However, in the same breath, the dissent also argues that Moore's taking Robinson to one of the sessions waived the privilege. The record indicates that Johnson is a psychotherapist. Pursuant to Rule 503 of the Mississippi Rules of Evidence, a psychotherapist is a person authorized to practice medicine and is bound by the medical privilege.
[4] Despite this exchange between counsel, the majority concludes that there was "no evidence produced at trial which proves Robinson's presence at either of the counseling sessions allegedly attended by Moore." In essence, the majority criticizes the fact that I accept the statement of both counsel to establish, for the limited purpose of the proffer, that Robinson was indeed present. Nevertheless, the majority accepts only the statement of counsel to establish the fact that Ms. Johnson was a psychotherapist.
[5] In her brief, Robinson's counsel claims that Robinson should have been allowed to testify about parts of the conversation. The State's motion in limine did not directly seek to exclude Robinson's testimony about the communications made during the session she attended. There was no attempt by the defense to question Robinson about these communications and arguably no attempt to proffer Robinson's intended testimony. However, the court's ruling on the motion would have prohibited Robinson from testifying about such communications.
[6] A proffer is typically allowed in one of four forms. The court may allow counsel to (a) dictate the anticipated testimony into the record, (b) introduce a written statement of the anticipated testimony, (c) introduce a written statement of the witness' testimony signed by the witness, or (d) examine the witness out-side the presence of the jury. Kenneth S. Broun & George E. Dix, McCormick on Evidence § 51 (5th ed.1999) (citing Ladd, The Need in Iowa of an Offer of Excluded Testimony for Appeal, 18 Iowa L.Rev. 304, 318 n. 28 (1933)).
[7] In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that a defendant's rights of confrontation and due process require the prosecution to turn over to the defendants all exculpatory evidence in their possession.